# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 06 2019, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

## I N   T H E
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent–Child Relationship of: L.B. (Minor Child)

and

B.B. (Mother),

*Appellant-Respondent,*

*v.*

The Indiana Department of Child Services,

*Appellee-Petitioner.*

November 6, 2019

Court of Appeals Case No. 19A-JT-1270

Appeal from the Montgomery Superior Court

The Hon. Heather L. Barajas, Judge

Trial Court Cause No. 54D01-1807-JT-215

**Bradford, Judge.**

# Case Summary

[1] L.B. ("Child") was born to B.B. ("Mother") and L.B. ("Father")[1] (collectively, "Parents")[2] in November of 2016 and was removed from Parents' care when he was approximately one month old. The Indiana Department of Child Services ("DCS") removed Child due to concerns about Parents' drug use and missed doctor's appointments for Child, who was born with a heart defect. Over the course of the next two years, Mother did not progress in her court-ordered services, obtain stable housing or employment, or demonstrate that she had the ability to satisfy Child's considerable medical needs. In July of 2018, DCS petitioned for the termination of Mother's parental rights to Child ("TPR Petition"). In May of 2019, the juvenile court granted DCS's TPR Petition. Mother contends that the juvenile court erred in concluding that there is a reasonable probability that the conditions that led to Child's removal from her care will not be remedied. Because we disagree, we affirm.

# Facts and Procedural History

[2] Child was born on November 29, 2016, with tetralogy of Fallot, a condition involving a hole in his heart that left him susceptible to "tet spell[s,]" during which he would pass out, turn blue, and stop breathing, requiring special techniques to revive him. Tr. Vol. II p. 159. Having received allegations of

---

[1] Father relinquished his parental rights to Child on January 17, 2019, and does not participate in this appeal.

[2] Parents had a second child together on January 2, 2019, who is not involved in this case.

drug use by Parents, DCS became involved and Family Case Manager ("FCM") Bethany Line spoke with Parents on December 9, 2016. Samples were collected, and Mother tested positive for marijuana. Around December 16, 2016, DCS received a report that Parents had failed to take Child to two doctor's appointments. Meanwhile, drug screens were collected on December 15 and 21, 2016, and Mother again tested positive for marijuana in both.

[3] On January 9, 2017, as a result of positive drug screens and missed medical appointments, the State alleged Child to be a child in need of services ("CHINS"). DCS removed Child from Parents' care on January 11, 2017, and placed him in foster care. In February of 2017, FCM Andrea Long took over the case. On February 28, 2017, following a hearing, the juvenile court found Child to be a CHINS and issued a dispositional order and a parental-participation order ("PPO") in which Mother was ordered to participate in several services. FCM Long later indicated that Mother never made the required progress in her services.

[4] Jane Sue Hortin, a life-skills specialist working for Cummins Behavioral Health, supervised Mother's visits with Child. Initially, Mother had two visits per week, which were increased to three when Hortin's schedule allowed, but were eventually decreased to two per week due to Mother's poor attendance. Hortin attempted to help Mother with parenting skills, such as not letting Child stand in a rocking chair, pull cords, take big bites, or destroy the property of others. As it happened, Mother never had unsupervised visitation with Child because she did not make sufficient progress with her parenting skills. Mother

provided inappropriate food for Child at his age and always had to be directed on how to feed him. Mother admitted that she had taken McDonald's food to Child several times and had continued to do so even after her home-based caseworker had told her that such meals were inappropriate. During the visits, Mother was frequently on her mobile telephone even though Hortin had told her not to use it. Hortin also attempted to help Mother with basic living skills such as hygiene, budgeting, medicine management, emotion regulation, healthy relationships, communication skills, coping skills, and relapse prevention.

[5] Hortin also set some goals for Mother that, if achieved, were intended to improve her situation, such as obtaining a driver's license and a GED. Mother, however, did not obtain a driver's license or even a learner's permit. Mother testified that she had taken the written driver's test four or five times but had not passed even though she had read through the driver's manual. Mother also failed to obtain a GED, even though she knew that not having her GED was a violation of her PPO.

[6] After Child was removed, Mother attempted to make it to most of the doctor's appointments, and her home-based worker provided transportation. However, during the appointments, Mother was often on her mobile telephone, even while the cardiologist was talking. In the foster mother's opinion, Mother did not fully appreciate, or have the experience and support from family and friends to handle, Child's medical condition.

[7] As for addressing any of her mental-health issues, Mother began seeing a psychiatrist in March of 2017. Mother also began to attend individual therapy

but was discharged because she was unable to "cognitively process for therapy purposes." Tr. Vol. II p. 140. Mother underwent a psychological evaluation in February and March of 2018. Mother told the evaluator that she suffered from ADHD, PTSD, and severe depression, the latter two as a result of witnessing a friend get shot to death, being raped at the age of fifteen, and losing an aunt to suicide. According to the evaluation, Mother's overall cognitive ability falls between "well below average" to "low" range of intellectual functioning. Ex. Vol. p. 247. Mother was diagnosed with PTSD in partial remission. A letter written on January 17, 2019, by a psychologist and a licensed mental-health counselor states that Mother participated in therapy sessions on four occasions, failed to attend a scheduled session on one occasion, and cancelled her sessions on two occasions. The letter also states that Mother did not progress during the therapy sessions and that Mother's IQ was 72, which is in the third percentile. Because of Mother's lack of progress and low IQ, the therapy team decided that Mother "was inappropriate for insight based therapy." Ex. Vol. p. 250.

[8] Meanwhile, Mother and Father were in an on-and-off relationship during the CHINS case. Although Mother told FCM Long that she and Father were just friends, in May of 2018 she moved into a residence where Father also resided. (Tr. 141). As far as Hortin knew, as of December 20, 2018, Parents were still romantically involved, and they had a second child on January 2, 2019. Father stayed with Mother and their second child for at least two weeks following the birth, during which Mother remained hospitalized. Moreover, both Mother and Father threatened FCM Long during the pendency of the case. Mother

said that she was angry with FCM Long and that that "things were going to happen to [FCM Long.]" Tr. Vol. II p. 142. Father threatened to kill FCM Long, the foster parent, the home-based case manager, the baby, and everyone working with Parents on the case.

[9] Mother's housing situation was unsettled during the pendency of this case. When Mother was pregnant with Child in 2016, she lived in Father's mother's house. A few months after Child was born, Mother moved in with her own mother. Mother's mother had used illegal drugs for years, and her residence was not appropriate for Child. In fact, Mother's mother was on probation during most of the pendency of this case. Although DCS told Mother about housing through Pam's Promise, Mother refused to apply. A couple of days before her second child with Father was born on January 2, 2019, Mother moved in with her aunt. Mother does not have her own bedroom at her aunt's trailer; she sleeps on the floor or in a rocking chair. Hortin helped Mother fill out applications for government-assisted housing, but, although Mother was approved, she did not have a job, a down payment, or the money for utilities.

[10] As for Mother's employment history, it is sporadic. Mother testified that she was employed at Best Western for "[a] month or two" in 2017 and at LSC Communications and Taco Bell in 2018, with a three-month gap between those two jobs. Tr. Vol. II p. 59. Mother left LSC Communications because she was pregnant with her second child and was expected to lift over fifty pounds, which she was unable to do. After the three-month gap, Mother only worked at Taco Bell for about three weeks before leaving. All of Mother's jobs have been part-

time jobs, and her wages were $10 per hour at each. Mother told FCM Long that her paycheck was $400 per month but provided no verification. Even so, Mother's employment would not have provided for her and Child's needs. As of January 17, 2019, Mother was still hospitalized while recovering from the Caesarian-section birth of her second child and not employed, indicating that her doctor had told her not to work.

[11] Mother's compliance with orders and services intended to address her substance abuse was also sporadic but generally positive. Initially, FCM Long occasionally had to "chase [Mother] down" to perform a drug screen. Tr. Vol. II p. 137. However, after initially denying it, Mother eventually admitted that she had indeed used marijuana before Child was removed and that she had received it from Father's friend. Mother underwent drug testing between December of 2016 and December of 2018. On several occasions in 2017, Mother tested positive for low levels of delta nine tetrahydrocannabinol a/k/a "parent THC" and once for methamphetamine. Tr. Vol. II p. 39. Mother had no positive drug screens in 2018.

[12] Meanwhile, on April 24, 2017, Child underwent open-heart surgery to correct his heart condition. Hospital personnel told Child's foster parents that Child was not going to have tet spells after the surgery. Child, however, did have a seizure one night, and when he was taken to Riley Children's Hospital in Indianapolis, the foster parents learned that he had epilepsy. Child is currently on medication for epilepsy, and the dosage will constantly have to be adjusted as he grows. Child's foster mother received training regarding Child's epilepsy

at Riley, and while Child lived with them, Child's foster parents were in constant communication with a neurologist.

[13] More recently, Child has moved to his pre-adoptive home. Child's prospective adoptive parents have a three-bedroom house and are a good fit for Child. Prospective adoptive mother and Child have developed a bond, and she has received training regarding children with seizures. Prospective adoptive parents have been married for seven years and wish to adopt Child despite his health issues.

[14] On July 27, 2018, DCS filed the TPR Petition. On October 30, 2018, and January 17 and 18, 2019, the juvenile court conducted an evidentiary hearing on the TPR Petition, with all of the substantive evidence admitted on January 17 and 18, 2019. Although Mother testified that she was no longer, and did not intend to be, in a relationship with Father, she had said the same thing to an FCM before the conception of their second child together. Indeed, Mother testified that she had ended her romantic relationship with Father before the birth of their second child but also testified that Father was at the hospital with her for the two weeks she stayed at the hospital after the birth.

[15] As for addressing her substance-abuse issues, Mother testified that she had attended substance abuse classes for a couple of weeks but stopped going because she did not like being around others. Mother testified that she had known that pursuant to the PPO she was not to use any illegal substances but also testified that she did not know her marijuana consumption would be a violation of that order. Mother also testified that when she tested positive for

methamphetamine it was because she had been exposed to Father's methamphetamine use.

[16] Hortin testified that she did not observe much bonding between Mother and Child, Child did not want to take his toys to Mother, and Child became upset when Hortin walked him to Mother during visitation. Child, however, would take toys to Hortin and Kate Doty, the court appointed special advocate ("CASA"). Hortin testified that she had not seen any marked improvements in Mother's parenting skills and was concerned about Mother's abilities to provide care for Child. CASA Doty testified that it was in Child's best interests for Mother's parental rights to be terminated. In CASA Doty's opinion, Mother had not progressed through services and "there has not been any substantial stability obtained for her to be able to care for [Child.]" Tr. Vol. II p. 225.

[17] On May 20, 2019, the juvenile court granted DCS's TPR Petition in an order that provides, in part, as follows:

> 31. The DCS has proven by clear and convincing evidence that the child has been outside of [Parents'] home under a dispositional decree for at least six months, and that [Child] has been removed from [Parents] and has been under the supervision of the DCS for at least 15 months of the most recent 22 months after the date of removal.
>
> 32. The DCS has proven by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in [Child's] removal or the reasons for placement outside the home of [Parents] will not be remedied. [Child] was removed from [Parents] on January 9, 2017. The DCS has offered reunification services to [Parents] but neither parent was

able to participate in these services in order to overcome their parenting deficits.

33.    The DCS has proven by clear and convincing evidence that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of [Child].

34.    The DCS has proven by clear and convincing evidence that termination is in the best interests of [Child]. Neither parent is in any better position to provide [Child] with appropriate care, supervision or a safe, nurturing and stable home than they were at the beginning of DCS'[s] involvement with the family.  Neither parent can meet [Child's] needs. [Child] needs a stable and nurturing home to meet his many needs. In addition, [Child] has specific medical needs that require a heightened level of parenting, which Mother cannot provide. Both the DCS case manager and the CASA believe that termination is in the best interest of [Child].

35.    The DCS has proven by clear and convincing evidence that there is a satisfactory plan for [Child] post-termination and that is adoption.

Order pp. 6–7.

# Discussion and Decision

[18]    The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children.  *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 145 (Ind. 2005).  Further, we acknowledge that the parent–child relationship is "one of the most valued relationships of our culture."  *Id.*  However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents.

*In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the children's interest in determining the appropriate disposition of a petition to terminate the parent–child relationship. *Id.*

[19] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rts. of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.* In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

[20] Indiana Code section 31-35-2-4(b) governs what DCS must allege and establish to support a termination of parental rights. Of relevance to this case, DCS was required to establish, by clear and convincing evidence,

> (A) that […] the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

[….]

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child.

[…]

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[21] Mother does not dispute the juvenile court's findings that Child was removed for at least six months pursuant to a dispositional decree, termination is in Child's best interests, or DCS has a satisfactory plan for the care and treatment of Child. Mother contends, however, that DCS has failed to establish that there is a reasonable probability that the conditions that resulted in Child's removal would not be remedied.

## Indiana Code Section 31-35-2-4(b)(2)(B)

[22] Mother contends only that the record does not establish that there is a reasonable probability that the reasons for Child's continued removal would not be remedied. The juvenile court, however, also found that there is a reasonable

probability that the continuation of the parent–child relationship poses a threat to the well-being of Child. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only establish one of these circumstances. *See* Ind. Code § 31-35-2-4(b)(2)(B) (providing that DCS must establish that one of the following is true: "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[, t]here is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child[, or t]he child has, on two (2) separate occasions, been adjudicated a child in need of services"). Because Mother does not challenge both of the above findings, her argument, even if meritorious, cannot prevail.

[23] That said, we nonetheless choose to address the merits of Mother's contention that DCS has failed to establish a reasonable probability that the reasons for Child's continued removal would not be remedied. In making such a determination, a juvenile court engages in a two-step inquiry. First, the juvenile court must "ascertain what conditions led to their placement and retention in foster care." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). After identifying these initial conditions, the juvenile court must determine whether a reasonable probability exists that the conditions justifying a child's continued "placement outside the home will not be remedied." *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (citation omitted). The statute focuses not only on the initial reasons for removal "but also those bases resulting in continued placement outside the home." *In re A.I.*, 825 N.E.2d 798,

806 (Ind. Ct. App. 2005), *trans. denied*. In making this second determination, the juvenile court must judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re D.D.*, 804 N.E.2d at 266. DCS need not rule out all possibilities of change; rather, it must establish that there is a reasonable probability that the parent's behavior will not change. *In re B.J.*, 879 N.E.2d 7, 18–19 (Ind. Ct. App. 2008), *trans. denied*.

[24] Here, Child was removed because of Parents' substance abuse and concerns about their ability to care for him. Within a month of Child's birth, Mother had tested positive for marijuana three times. Of greater concern, Child was born with a congenital heart defect that left him susceptible to tet spells until the condition was surgically corrected some months later. Neither Mother nor Father demonstrated at the time that they were equipped to address Child's medical needs.

[25] As for whether the conditions that led to removal are likely to be remedied, Child will still need considerable medical care in the years to come, as he has now been diagnosed with epilepsy that will require the ability to (1) deal with possible seizures and (2) administer medication, the dosage of which will frequently have to be adjusted as he grows. In light of this, Mother's demonstrated lack of appreciation of Child's medical needs is of great concern. Mother failed to deliver Child to multiple doctor's appointments in his first month and would look at her mobile telephone during appointments with his cardiologist. Even now, Mother does not seem to grasp the seriousness of

Child's medical condition, has not gone through the specialized training required to manage it, and will be therefore unable to help Child when needed. Indeed, Mother has not demonstrated that she is even able to appropriately feed Child, nor has she obtained her driver's license.

[26] As for Mother's progress in other areas, multiple witnesses testified that she had not progressed in her court-ordered services. Although Mother's recent drug screens have been clean, concern over substance abuse has not been completely alleviated, because Father is a drug user and Parents' relationship appears to be ongoing. Although Mother has claimed in the past that her romantic relationship with Father is over, their second child was born some two weeks before the evidentiary hearing, Father spent those two weeks in the hospital with Mother and their second child, and there was testimony that they had still been together the month before that. Mother has also not resolved her housing or employment issues, which relate directly to her ability to care for Child. As of the date of the termination hearing, Mother was staying in her aunt's trailer, sleeping on the floor or on a rocking chair in the common area, and was unemployed. Although Mother testified that she was under doctor's orders not to work at the time of the evidentiary hearing, her work history in general has been sporadic at best. Mother has had several jobs since 2017, seldom staying for very long and never making more than $10 per hour. In summary, Mother has not demonstrated that she is no longer in her toxic relationship with Father or that she has the ability or wherewithal to adequately care for Child. Put

another way, not much has changed in the two years following Child's removal from Mother's care.

[27] While we recognize that some of this may be a result of Mother's low intellectual functioning, an inability to adequately care for Child could threaten his life, whatever the root cause of that inability. The Indiana Supreme Court has made clear that the "purpose of terminating parental rights is not to punish parents, but to protect the children." *Egly v. Blackford Cty. Dep't. of Pub. Welfare*, 592 N.E.2d 1232, 1234–35 (Ind. 1992). The *Egly* Court also explained that "[a]1though parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents." *Id*. at 1234. Put another way, the goal is to fix the problem, not the blame. Under the circumstances, the juvenile court did not err in finding that there was a reasonable probability that the conditions that had led to Child's removal would not be remedied.

[28] The judgment of the juvenile court is affirmed.

Vaidik, C.J., and Riley, J., concur.